[Circuit Court of Erie County.]

HURON DOCK CO. v. MAGGIE SWART, ADMINISTRATRIX, AND MYRON T. HERRICK AND ROBERT BLICKENSDERFER, RECEIVERS OF WHEELING & LAKE ERIE RY. CO.

Decided January 19, 1903.

*Bills of Exceptions—Can Not be Amended After Being Signed—By Attaching Exhibits Left Unattached or Imperfectly Identified—But if Not Correct, or Otherwise Deficient, Such Exhibits May Be Disregarded—And the Case Reviewed on Weight of the Evidence—Materiality of Exhibits—Identification of—Questions of Negligence Where a Night Watchman Was Run Over in the Yard He Was Watching—Amendment of Petition After Verdict.*

1. The identification of an exhibit by marking it "Ex. 1" with the number of the case on trial and the initials of the official stenographer, is not so clear and unmistakable that the exhibit may thereafter be regarded as constructively attached to the bill of exceptions.

2. A bill of exceptions can not be amended or corrected after the time for its being signed has expired, by attaching maps or plats submitted in evidence as exhibits at the trial below, but not physically attached to the bill or properly identified as belonging to it.

3. But where it appears that such maps or plats were not correctly drawn, and contained no marks indicating the courses and objects pointed out to the jury upon such maps, they do not constitute a material part of the evidence, and a reviewing court is at liberty to consider the case on the weight of the evidence without regard to such maps.

4. To permit, after the verdict has been returned, an amendment to the petition, which presents facts and issues not submitted to the jury or referred to in the charge of the court is error.

5. Where the night watchman on a coal dock, while crossing railway tracks with the location of which he is familiar, is struck by a car which, from the sound at the "tipple," he should have known was moving in that locality, without a light being carried upon it, he is guilty of contributory negligence, and there can be no recovery on account of his death.

PARKER, J.; HAYNES, J., and HULL, J., concur.

Error is prosecuted to a judgment of the Court of Common Pleas of Erie County. The action in the court below was brought by Maggie Swart as administratrix of John Swart, on account of the death of her husband from injuries received while in the employ of the Huron Dock Company, which death she charges was due to the negligence of the Huron Dock Company, and also to the negligence of the receivers of the Wheeling & Lake Erie Railroad Company. She recovered a judgment for $5,000 against both companies. The petition in error in this case is filed by the Huron Dock Company, asking for a reversal of this judgment, and the receivers of the Wheeling & Lake Erie Railroad Company have filed a cross-petition in error, also asking for a reversal of the judgment.

The accident happened upon the docks of the dock company in the village of Huron, in Erie county. It appears that at their docks they have tracks and the ordinary appliances and facilities for unloading coal from flat cars and loading the same into vessels drawn up alongside of the dock; that at a certain point upon their tracks is an appliance called a tipple that in some manner seizes the car and tips it, dumping or emptying the contents into buckets, whereby the same are carried thence into the vessel; that the railroad company delivers the loaded cars at this point upon the dock, to-wit, at the tipple, where they are received by the dock company and emptied and then run upon certain other tracks, where the railroad company receives and takes them away in the form of trains of empty cars.

The plaintiff in her petition avers that John Swart, the decedent, was employed by the defendants (but the evidence shows that his employment was by the dock company), and complains that on the occasion when this accident happened, which was in the night time, about midnight, the docks were not properly lighted, so as to make it safe for one engaged as deceased was engaged in working for the company; that they were not sufficiently lighted to enable one engaged as he was to observe moving cars upon the dock tracks. The petition also charges that the safety of decedent required that all such cars should be equipped with good and sufficient brakes, so that the same could

be stopped within a short distance and persons would not be injured by said cars; that the safety of decedent further required that the defendants should have and enforce certain rules by which a warning of the approach of cars would be given by a whistle or bell, or by some other means to men who might be upon the side-tracks; that upon the occasion of this accident, to-wit, on July 28th, Mr. Swart, who was engaged as a night watchman, and whose duty required him to be upon the docks, was required by his superior, a foreman in the employ of the dock company, to leave a position of safety that he occupied at a certain shanty, and cross certain tracks to another point to the northward and eastward of that place, to an oil house and there obtain coal oil with which to supply certain torches that were then in use upon the docks for the lighting of the same. It appears that one of these torches was beginning to burn low, in consequence of the supply of oil failing. The petition charges that while Swart was thus in the performance of his work, the defendant did wrongfully, carelessly and negligently cause a railroad car to be run upon said track without giving any warning to said Swart of its approach; that the defendants were further careless and negligent in that the brakes on said car were in such defective condition that the man upon said car at said track was unable to control the movements of said car. The petition does not point out the defects, but avers that plaintiff does not know the nature of the defect, and that it was well known to the defendants that there was such a defect in the car, or that it had existed for such length of time that the defendant ought to have known of its existence.

The petition further charges that the defendants were careless and negligent in that they had failed to provide good and sufficient lights by which to perform such work, and a rule by which men in charge of the engines and cars in said yard and in charge of said work were required to give warning to the said deceased of the approach of cars; that while deceased was thus about his work, and in the act of going along and across one of the said tracks, said car which had been thus set in motion, ran down and upon him, and struck him, throwing him upon the track and running over him, inflicting injuries that caused his

death soon thereafter; that no bell was rung, no whistle sounded, or other sufficient warning given to said decedent of the approach of said car; that the injuries were received in the night time when it was dark, and decedent was unable to see the approach of said car; that he did not know and had no means of knowing that said car was defective, and was approaching on said track, and that he was without fault contributing to the injuries thus received.

The separate answers of the defendants respectively deny all these charges of negligence, and aver that the decedent was guilty of negligence contributing to his injury. The motions for a new trial on behalf of the defendants below, respectively, are identical in form, and they set forth as grounds for a new trial: (1), That the verdict was against the weight of the evidence; (2), that the damages are excessive and appear to have been given by the jury under the influence of passion and prejudice; (3), that the court erred in rejecting evidence offered by the defendants; (4), in receiving evidence offered by the plaintiff; (5), in its charge to the jury; (6), in refusing to charge in writing before argument as requested by the defendants; and (7), on account of misconduct of the jury and of the plaintiff.

Now we are met at the threshhold with the suggestion on behalf of the defendant in error, Swart, that the bill of exceptions is not sufficiently complete to authorize the consideration of such questions as require the weighing or examination of all the evidence. Certain plats or charts were introduced in evidence that are not physically attached to the bill of exceptions; and our attention has been called to decisions by this court and by other circuits courts of the state to the effect that charts or papers of this description used in cases of this character and introduced in evidence must be attached to the bill of exceptions, and thus brought up to the reviewing court; and the law appears to be very distinctly laid down in those cases, where papers are of a character and are used in such way as that the jury had before it competent evidence in the form of plats or maps that would aid it in the consideration of the evidence, and the same are not presented to the reviewing court, the latter court is without

power to consider the case upon the weight of the evidence; that such papers must be attached, either physically, or, where that is inconvenient, because of their bulk or for any good reason, they must be constructively attached, and in the latter case the reference to the same must be so explicit and the plats must contain in and upon themselves such clear and unmistakable evidence of identity as to make it certain that they are the same plats referred to in the bill of exceptions. I refer especially to the case of *Michigan Cent. Ry. Co.* v. *Waterworth*, 21 C. C., 495, *Foster Coal Co.* v. *Moherman*, 9 C. C., 544, which will be noticed again in the course of this opinion. We are not disposed to depart from the rules laid down in these cases, though it must be admitted that such plats, used as aids to enable the jury to understand and apply the evidence, very much as a view of the premises is used, do not stand upon the same footing as documentary or oral evidence, and their production does not seem to be in all instances absolutely essential or indispensable. But more will be said on this head further on.

Now we have evidence here in the way of affidavits filed on behalf of all the parties upon the question whether these plats were ever attached to the bill of exceptions, that is to say, physically attached; and from this evidence it appears entirely clear they were not; that counsel preparing the bill of exceptions presented it to counsel for the opposing side for examination and to the trial judge for allowance, without the plats being attached. According to his affidavit, he called attention of opposing counsel to the fact that the plats were not then attached, and stated that it was his purpose to attach them, and no objection was made to his doing so. But upon that point there is some conflict in the evidence; the other attorney testifying that he does not remember that anything of that kind occurred. It is undisputed that counsel preparing the bill of exceptions carried it to the clerk to be filed, and that the plats were at that time in the possession of the clerk, part of the archives or files of the office, and that he was directed to attach them and agreed to do so, but finding it inconvenient to have these large plats attached to the bill of exceptions, he failed to attach them, put the plats in one place and the bill of exceptions in another place, and, dur-

ing the cleaning up of his office, the plats were carried to another part of the court house and placed in storage for a time, while the bill of exceptions was regularly filed in his office; but the plats were never physically attached to the bill of exceptions. Such articles may be attached as I have indicated, by reference to them in the bill of exceptions, if the means of identification, taken in connection with the reference, appear upon the face of the plat.  But a majority of the court are of the opinion that the means of identification do not appear with sufficient clearness upon the face of these plats; we are unanimous in that view as to the plat called the "blue print," which has upon it simply the mark, "Ex. A."  This, according to the testimony of the court stenographer who took the testimony in the case, is not in his handwriting.  Neither the number of the case, nor the title of the case appears upon the plat, and we are not advised as to who put upon it the letters, "Ex. A."  The other plat, however, of a light color, has marked upon it by the stenographer who took the testimony in this case the figures 8958, which is the number of this case in the Common Pleas Court of Erie County, also "Ex. 1," indicating Exhibit No. 1, and the initials of the stenographer, "W. H. W.," for W. H. Watts.  One member of the court is of the opinion that this affords sufficient means of identification of the plat appearing upon its face, in connection with the testimony of the witnesses as to the nature of the plat and the reference in the bill of exceptions to a "light colored plat," which appeared to have been marked Exhibit No. 1 and introduced in evidence.  But the majority of us are of the opinion that more than that is necessary to distinctly identify it, so that it might be said to be attached by reference.  The number of the case, the title of the case, and the court, we think should appear, though we are not prepared to say that all of these things must appear as means of identification.  Here we have neither the title of the case, nor the name of the court.

Now counsel for the receivers and the dock company interpose a motion for leave to bring up a more perfect record upon suggestion of diminution of the record to enable them to apply to the court below to have the bill of exceptions amended in this particular, either by having the plat physically attached or by

having them attached by distinct and explicit reference, and they ask for a postponement of further consideration of the case pending such proceeding. This motion we will allow to be filed, as of the term. This motion, however, should not be granted by this court, unless we would sustain the amendment, if made; in other words, if we are of the opinion that the court of common pleas is without power to permit or order the amendment, of course we should not postpone consideration or decision of the case, in order that application for such amendment may be made.

In this state there has been a high degree of strictness in the holdings with respect to the observance of the rules prescribed for perfection of the bill of exceptions; it seems to have been treated as a peculiar part of the record, as if there was some sort of sacredness attaching to a bill of exceptions, not affecting other parts of the record, so that it can not be changed or amended, or anything whatever done to save a case dependent thereon, unless it has been fully prepared within time, signed, sealed and filed and a journal entry of its allowance put upon the journal. In other jurisdictions, however, the holdings have not been so strict upon the question of the amendment of a bill of exceptions. 2 Thompson Trials, Section 2828, says, as follows:

"A bill of exceptions being a judicial record, the power to amend it stands upon the same footing as the power to amend other judicial records. Being a record, it must carry with it its own verity, and, if defective, *can not be amended by affidavits* or other extraneous evidence. If *improper entries* are made in the bill by a misprint of the clerk or of counsel, great difficulty will attend the correction of them. In a case in Arkansas the clerk inserted instructions in the bill which were not intended to be therein inserted. The Supreme Court said: 'The efforts to correct this by *certiorari* are futile. If not brought into the record by the bill of exceptions, the instructions can not be noticed. This court, on appeal, can act upon the record alone, and must act on what appears there. Although entirely satisfied, as men, that his honor, the circuit judge, did not give the instruction contained in the transcript, in the connection shown, and that he did give other instruction, which, whether erroneous or not, were certainly pertinent to the issue, we can not know it judicially. It was error to give the instructions as they appear.' And the court accordingly reversed the judgment, for

the giving of instructions which the judges, *as men,* knew had never been given. This seems to be carrying what is termed 'technicality' to an extreme. There surely ought to be some way by which such misprison can be corrected. There is a very simple way. The rule which obtains in Missouri that, even after an appeal or writ of error, the court below retains jurisdiction over its own record for the purpose of amending it, should be applied in such a case; and the appellate court should, on application, postpone the hearing of the case until the trial court can have the opportunity of amending its bill of exceptions, which, as thus amended, can be brought to the appellate court by a *certiorari.* The record is in the breast of the judge during the term, and the court may then freely amend it, so as to make it conform to the facts; but, after the lapse of the term, it has so far passed beyond his authority that he can not amend it unless some written memorial remains to amend by. This principle has been frequently applied to the subject of amendment of bills of exception. 'It can not be supposed,' said Owsley, J., 'that the power of the court over bills of exceptions absolutely ceases upon their signing them, and if it does not, the only limitation in point of time for the exercise of that power must be at the end of the term at which exceptions may be filed.' "

The decisions of the Supreme Courts of Indiana and Kentucky support these views. We find a case decided by the Superior Court of Cincinnati in 1859 in harmony with this view, which seems to us to contain a great deal of sound sense. The case of *Hazlewood* v. *Parker,* 2 Disn., 429, was there held as follows:

"The power of amendment, in the general terms, conferred by the code (Section 137) extends as well to a bill of exceptions as to any other part of a record, when the proposed amendment is in furtherance of justice."

It appears that a certain paper was introduced in evidence, which was marked "Exhibit A." The transcript was sent up to the Supreme Court, and it was there discovered for the first time that the exhibit had not been attached to the bill of exceptions. Thereupon application was made to the superior court for leave to amend the bill of exceptions, and Gholson, J., said:

"I know of no reason why the power of amendment, in the general terms, conferred by the Code, Section 137 (Section 5114, Revised Statutes), should not extend as well to a bill of exceptions as to any part of the record, when the proposed amendment is in furtherance of justice, and will prevent a party from

being tripped up by a technical objection. The only objection is whether, in such a case as this, there is anything to amend by, and I am clearly satisfied there is. The paper which is found in the file is shown, by clear and inherent evidence, to be the one intended to be marked and attached, and I shall, therefore, direct it to be done."

The judge calls attention to some authorities and there is some further discussion of the question.

Here, while the plats referred to do not contain this inherent evidence of identity, the evidence submitted to this court satisfies us beyond doubt that these are the identical plats that were submitted in evidence as exhibits (Exhibit 1 on behalf of the plaintiff, and Exhibit A on behalf of the defendants), and if the power to amend resided in this court we would proceed without hesitation to permit the amendment; or, if the power to amend should reside in the court below, we are of the opinion that the court would be authorized to proceed upon this evidence and permit the amendment to be made.

But we find that in the case of *Busby* v. *Finn*, 1 Ohio St., 409, decided in 1853, not referred to by Judge Gholson, but referred to by other courts which has assumed to follow it, the power to make such amendment is denied. The syllabus reads:

"To make a paper a part of a bill of exceptions it must be incorporated in it, or attached to it, or filed with it, and so described as to leave no doubt of its identity. When not so made a part of the bill the defect is not cured by a journal entry directing it to be taken as a part thereof.

"A bill of exceptions must be signed and sealed at the term at which the exception is taken, and it can not be amended after that term. A *nunc pro tunc* order made at a subsequent term to the effect that a paper not identified by the bill shall be considered as a part of it is a nullity."

The opinion is by very eminent authority, Judge Thurman, and he has this to say touching the necessity of physical attachment or clear identification of documentary evidence, page 411:

"Among the papers before us are certain papers marked respectively A, B, C, D, E, F and H, but neither of them is, in any way, attached to the bill of exceptions, nor does either of them bear any file mark of any court, nor are they, or either of

them, referred to in the pleadings, or verified or even alluded to in any return or certificate of the clerk of the common pleas—in a word, we have nothing whatever from which we can properly take notice that these papers are the same papers mentioned in the bill of exceptions.  We do not mean to say that it is indis-. pensable to copy into, or actually attach to, a bill of exceptions every paper making part of it, though *Hicks* v. *Person,* 19 Ohio, 446, seems to require this.   Such a description may be given of an exhibit as to leave no doubt of its identity when found among the papers; but, on the other hand, the description may be.so loose that of a number of papers each one will satisfy it just as well as any other.   Thus, in the present case, the bill states that 'the defendants gave in evidence the record of the judgment in Marion county hereto attached, marked 'A,' but no such record is attached or marked as. filed, or mentioned in the pleadings, or referred to in any return or certificate of the clerk of the court.   It is therefore manifest that *any* record of *any* judgment of *any* court in Marion county, and between *any* parties satisfied the description in the bill of exceptions, provided it is marked 'A.' ''

He says substantially the same with respect to the other exhibits; then as to an attempt made to reform the bill of exceptions, after giving a copy of a journal entry, designed to affect that purpose, he says, page 414:

''This is certainly a curiosity in the history of judicial proceedings.   The statute requires a bill of exceptions to be signed and sealed at the term at which the exception is taken, and it can not be done afterward (43 O. L., 80; *Hicks* v. *Person,* 19 Ohio, 426). But if the plan here attempted is permissible, signing and sealing are unnecessary, and a mere journal entry will answer for a bill of exceptions, and instead of the bill being perfected at the term in which the exception is taken, as is required by the statute, it may be completed at any subsequent term, even after the original papers are in the court of errors by a *nunc pro tunc* order, and that made by different judges from those who signed and sealed the bill.   Such a proceeding is wholly unauthorized, and the order in question is a nullity.''

Now that decision does not appear to go necessarily, or otherwise than as *obiter dictum,* beyond the method there pursued in attempting to amend a bill of exceptions, to-wit, by a *nunc pro tunc* order, or journal entry; yet it contains the general statement that an amendment can not be made after the term, which,

under the statute as it now reads, would be equivalent to saying after the expiration of the fifty days provided by law. But as I have said, other courts have relied upon that decision and construed it as holding the law to be as stated in the general language referred to, that an amendment of a bill of exceptions can not be made at all, or at least not after the expiration of the time fixed for its allowance.

In the case of *Pittsburg, C. & St. L. Ry. Co.* v. *Hart*, 10 C. C., 411, decided by the Circuit Court of Hamilton County, it was held that:

"To make a paper a part of a bill of exceptions, it must be incorporated in it, or attached to it, or filed with it, and so described as to leave no doubt as to its identity. When not so made a part of the bill, the defect can not be cured by obtaining an entry in the trial court at a subsequent term, directing it to be taken as a part of the bill."

Reading from the opinion:

"It was claimed in the court of common pleas, by the plaintiff in error, that defendant in error's right to recover must be governed by the law of Pennsylvania. And the law of Pennsylvania, as stated in 96 Pa. St., was offered in evidence, but within the time allowed for signing the bill of exceptions it was not made a part of the bill of exceptions. Upon the trial of the case in this court this omission was pointed out, whereupon counsel went to the court of common pleas, and upon motion at a subsequent term the correction was made, and the bill of exceptions amended. Could this be done? We think not. We are not aware that the rule laid down in *Busby* v. *Finn*, 1 Ohio St., 409, has ever been changed by our Supreme Court. It seems to us that the second paragraph of the syllabus in that case is directly in point, as well as the language of Judge Thurman in his opinion on page 414. If we are correct as to this matter, we can not consider the question attempted to be raised. Neither can we consider the question of error, that the verdict is against the evidence, as all of the evidence is not before us."

And in the case of *Haberty* v. *State*, 8 C. C., 262, also decided by the Circuit Court of Hamilton County, there is a like holding. The third paragraph of the syllabus is as follows:

"Where, in a proceeding in error, it is alleged that the bill of exceptions as signed by the trial judge, does not contain all

of the evidence which was heard at the trial, and a motion is made that it be returned to the trial judge for correction in this respect, the time allowed by law for the signing of a bill of exceptions in such case having expired, such motion should not be granted.    The trial judge has now no right to correct the old or sign a new bill of exceptions.''

Now we feel constrained to follow those decisions of the Circuit Court of Hamilton County, and rely upon their construction of this decision by the Supreme Court of Ohio, and therefore we overrule the motion for leave to correct this bill of exceptions in the manner desired, and exceptions to this order will be noted.

But that does not wholly dispose of the matter.    It remains to be considered whether the plats are a material part of the evidence.    The language of some of the decisions seems to be to the effect that if anything is introduced in evidence and is omitted, that is the end of the inquiry.    But we are of the opinion that where it is made to appear that the omission is wholly immaterial, such omission should not deprive the plaintiff in error of his right to have his case reviewed upon the weight of the evidence.    We are presented with a copy of the printed record in the case of *Aetna Life Insurance Co.* v. *Kosterman*, recently before the Supreme Court of this state.    It appears that that was an action to recover upon an insurance policy, and the question arose as to how the deceased came to his death, whether he came to his death in such manner as that the insurance company was liable under its policy or not; and in the course of the trial Gray's Anatomy was used in the examination of expert witnesses.    A doctor was asked if it was one of the standard medical and surgical works, and answered: ''It is.''    Question: ''I will call your attention to these plates and ask you what they represent?'' (exhibiting certain plates or charts of the human anatomy appearing in the book).    Objection was made. The court inquired: ''What is it for?''    Counsel answered: ''To make it plain to the jury by means of the picture.''    The objection was thereupon overruled, and defendant excepted and the answer was: ''These two plates represent the spinal cord stripped of its nerves and this plate represents the lower portion of the

spinal cord with the nerves attached." The plaintiff then offered the plates in evidence; objection was made to this, which was overruled upon his answering that "the drawing is a correct representation." Now counsel, in preparing their bill of exceptions, failed to attach the plates. The case went to the circuit court, and the circuit court held that it did not have all of the evidence before it, and that, therefore, it could not consider the case upon the weight of the evidence. Error was prosecuted to the Supreme Court, and that court, on the twenty-fifth day of last November, as appears from 47 Bull., 848, held as follows:

"Judgment is vacated and cause remanded to the circuit court with instructions to consider the bill of exceptions as to the weight of evidence, there being no material omission."

We are not enlightened by the Supreme Court as to why it considered this an immaterial omission; it may have been considered by the Supreme Court that it was not admissible; but their decision on this point amounts to a holding that where it appears that the part omitted is immaterial, it still devolves upon the reviewing court to consider the case upon the weight of the evidence. So we have proceeded to inquire whether in this case it appears that these plats referred to, which are omitted from the bill of exceptions, were a material part of the evidence.

Now I have already given a general statement of the cause of action and the *locus in quo,* and the fact that it appears that the deceased came to his death while upon certain tracks lying between the shanty, so called, where he was found by the foreman who directed him to go and get the oil, and the so-called oil shanty upon the other side of these tracks. A large part of the testimony of the witnesses, especially those on behalf of the plaintiff, is taken up with a description of these docks, and the tracks and other structures upon the docks, including the apparatus used for unloading the cars; and it seems to us that the description of the relative positions of objects, as given by the witnesses, of courses and distances, of the sizes of objects, etc., is so clear when we come to look into the testimony, that any

fairly intelligent person, such a person as a juryman is supposed to be, could sit down and make a fairly correct plat of the ground, or a plat sufficiently correct for the purposes of the case. It appears that the general direction of these various tracks upon the docks is north and south; that upon the eastermost of these tracks the loaded cars are brought up a grade to the tipple; that there they are unloaded; that when a car is there unloaded, another one is brought up and run against the empty car, and that it bunts it or moves it off of this part of the track onto a down grade toward the north; that at that point a person in the employ of the dock company takes charge of and gets upon the empty car to manage the brakes and to direct the movement of the car; to direct its course, control its speed and attain the ultimate object of bringing it upon certain of these tracks to the westward, where the empty cars may be taken again by the railroad company and hauled away. The car pursues its course toward the north on a down grade, being run by gravity; on reaching a certain point to the north it is stopped and turned so as to go upon these western tracks, and then by force of gravity it pursues its course toward the southward again and comes upon one of the four certain tracks lying to the westward of the track from which it has been taken; the particular track of these four upon which it shall be placed depends upon the direction given to it by the person upon the car, and the management of the switches that determine the course of the car is under his control and a matter of his discretion.

It is evident that this car had been unloaded at the tipple, brought to the extreme point at the north, started again on its course toward the south, to be put upon what is called here the "third" track of those lying west of the engine house, the shanty, the tipple, etc., that is to say, the third track beginning to count from the east of these four tracks. It was while it was being brought upon the third track to be deposited there that it ran upon the deceased and killed him.

As to the use made of these plats and as to their character, as shown by the bill of exceptions, without the aid of extrinsic evidence, we call attention to the reference made thereto by wit-

nesses and by counsel upon the trial. I should say, however, to render the plats admissible in evidence, it is necessary that there should be evidence of their accuracy and reliability, such as was required by the trial courts in the case of *Aetna Life Insurance Co.* v. *Kosterman, supra;* Jones on Evidence, Section 414.

Now the witness, Jamison, on behalf of the plaintiff, in his direct examination on page 4, refers to one of the plats. He is being examined by Attorney Thatcher on behalf of the plaintiff, who says:

"I will ask you to take hold of one end of *this drawing that I have attempted to make.* There is a place here marked shanty. What does that represent?"

He answers:

"It is a small shanty; we called it a winter shanty; it was for the men to stay there when they were working or when they were called out to go to work."

Now there was further testimony in the case, from which it appears that a plat, introduced as plaintiff's Exhibit No. 1, was a plat which the attorney for the plaintiff had made, or, as he says in his question, "attempted to make." It further appears in the case that he had not completed his attempt at the time he was making use of the plat; that much we ascertain from an examination of the bill of exceptions. Though we need not do so, we have no doubt but we have a right to examine these affidavits and exhibits, to. determine whether the evidence submitted was material, it appearing that the maps are clearly identified. And we find upon looking at the plat itself that it is what the attorney's question would indicate, a rough sketch that he probably made with a pencil during the trial of the case, and such a sketch, so far as appears, as any member of the jury may have made, and was well qualified to make by information touching the *locus in quo* after the oral evidence was in.

The witness, Vina, in his cross-examination, page 48, is examined with reference to the "blue print" by an attorney for the defendants, as follows: "I wish you would examine this blue print, Mr. Vina. This is the tipple, I will ask you if the shanty would be *about* in there (indicating). *This* is north. *This* is

supposed to be the four tracks." Answer: "Yes, I guess that would be about right."

Question: "I will ask you if the oil house would not be *there?*" Answer: "The oil house would be *across these tracks.*"

Question: "What was there to prevent Mr. Swart from crossing the track *there* and coming up *here* with his oil?" Answer: "There was nothing to stop him from crossing the tracks *here.*"

Question: "That would be just as soon as going across the track *there* as to come down *here* and cross *these four tracks?*" Answer: "It probably would."

It will be observed that something was done in the way of indicating upon the map, as the stenographer puts it, and perhaps pointing out objects upon the map; but it does not appear that any mark was made upon the map or anything done that would assist this court in determining what was indicated to the jury by the use of the map. If the map was presented here to this court, how would the court be aided by the indicating that was done by the witness or by the attorney in the course of his examination? If they had indicated by making marks when they referred to it in the course of the testimony, as a cross figure or letter, or anything of that sort, then that kind of evidence would be of some aid to this court, when it comes to weigh the evidence. It is to be remembered that this court is to be put in possession of such evidence as will aid it, and give it, so far as possible, the same advantages that the jury had in weighing the evidence. It is quite evident that this sort of reference to the map would be of no possible use to the court, and that it would make the testimony no more intelligible with the map before us than it would be without the map. It is impossible to say what points or localities were referred to by counsel and witness as "here" and "there," etc.

On re-direct examination Vina testifies (page 53 of the record), that the blue print shows four tracks back of what is marked as the engine house, and that there was another track there at that time, which is not indicated upon the blue print. Now that is drawn out by the cross-examination. No witness testifies that the paper is a correct representation of the situa-

tion. This witness, however—on behalf of the plaintiff—indicates that in one respect, at least, it is an incorrect and incomplete representation. The witness, Parker (page 61), seems to have made some use of the blue print. He was asked what course the men took when they went from the shanty over to the oil house. He answered: "Generally they would go just like *that*, as near as they could" (indicating on blue print). Now how would that blue print, with that kind of testimony, aid the court at all in weighing the evidence or even in ascertaining what the witness meant or indicated or pointed to when testifying.

In looking at the part intended to represent the shanty we see that it is no part of the blue print proper, but appears to be indicated in ink by some "pretice hand." The light-colored plat contains no clear indication of the points of the compass nor any scale by the use of which sizes or distances can be ascertained. In the cross-examination of Atkins (page 75) there is some evidence of the same character (indicating the place), but how he indicated, or that he caused any mark to be made on the blue print by which the court reviewing the case can see the point indicated, does not appear.

The witness Knowleton (page 111) is the last one to whom I shall refer on this head, and the pages referred to are, so far as we can discover, the only instances in which any references are made to either of these maps. Knowleton is asked with reference to the blue print by counsel for plaintiff: "I will show you a plat. You may state whether the square marked 'dumper' represents where the tipple stood and the square marked 'oil house' where the oil house stood. State if that represents the relative positions of the dumper and the oil house?" Answer: "*Nearly so.*"

Question: "With reference to these tracks, Nos. 1, 2, 3, 4, what is the facts as to their being *parallel and closer together than shown on the map?*" Answer: "I should say they were uniformly the same distance apart."

Upon looking at the plat we find that they are not a uniform distance apart, but almost run off on tangents, so that counsel succeeded in showing that both of the plats were incorrect. That

the maps were introduced in evidence appears at page 130 of the bill of exceptions.

In the case of *Michigan Cent. Ry. Co.* v. *Waterworth,* 21 C. C., 495, where we held that the omission of a map or plat used upon the trial of a negligence case was a material omission, and therefore we could not consider the case upon the weight of the evidence, this is said:

"One of the grounds of the motion for a new trial, and a ground that is now urged here on error, is that the verdict was against the weight of evidence. Upon looking into the bill of exceptions we find this condition: that there was a drawing used upon the trial, which appears to have been a diagram of the grounds where the tracks of the company were, showing the tracks, etc., where this accident occurred. This question of the location of the cars, and of their movements upon this occasion, became material. Witnesses were interrogated with respect to the position of certain cars, and in undertaking to state where the cars were situated and how they were moved, in order that their testimony might be understood by the jury, they were asked to dictate those positions and movements upon the map, which they did, and it appears from the record that in certain instances they made marks upon the map to indicate the positions about which they had testified, so that the map, after it had been thus identified and used, was a material document and piece of evidence in the case."

In the other case referred to where a plat was used. *Foster Coal Co.* v. *Moherman,* 9 C. C., 544, decided by the circuit court of the seventh circuit, in the opinion Judge Laubie said:

"So far as the verdict is concerned, we are not prepared to say but that it is right, but at all events we should not be at liberty to consider that question for the reason we do not have all of the evidence before us that was before the jury in the court below. They used a map largely in the testimony of this case, and witnesses pointed to it, pointed places out upon it, horse backs in the mine here and there, etc. It was patent and plain to the jury, but it was entirely unintelligible to us, so that in any event we could not examine the question whether the verdict was sustained by the weight of the evidence or not; but so far as it is disclosed, and treating these matters as to the map as immaterial, we do not see how the jury could have done anything else than what they did."

So it appears that the view of that court was that the map was of such a character that the court would have been aided by looking at it, would have been placed in the same position as the jury, having the map before it, and that the evidence submitted, unaided by the map, was unintelligible. We are clear that that is not so and can not be said with respect to the maps here mentioned.

We therefore hold that the maps are not a material part of this evidence; and that we are at liberty and are bound to consider this case upon the weight of the evidence.

Now the jury was asked to answer certain interrogatories, the purpose evidently being to have them indicate the respects in which they found the defendants respectively guilty of negligence, if they found them guilty of negligence, and in their answer to the second interrogatory they say in effect that the only fault they find on the part of the receivers of the railroad company was in turning over to the dock company a car with a defective brake. The witness, Charles E. Mindus, called on behalf of the plaintiff, testified that at the time the accident happened he was riding this empty car; that he saw the deceased somewhere from sixty to ninety feet to the southward of him as he ran upon track No. 3; that deceased was upon that track; that deceased appeared to be carrying a lantern in one hand and a bucket of oil in the other hand; that he appeared to be crossing the track in a southeasterly direction, which would be directly across from the oil shanty to the other shanty where he would fill the torch. Mindus says he cried out to Swart with all his might, to alarm him and warn him, so he would get out of the way; that he attempted to apply the brakes to the car; that if the brake had been in good condition, he would have been able to stop the car within three car lengths, or, as he says, within about ninety feet; but that the chain fastening in some way the brake shoe to the brake staff was defective or imperfect in that it was too long; that by twisting up the brake he was not able to bring the brake shoe with sufficient force against the wheel so as to cause it to operate as a perfect brake; therefore he was not able to stop the car in the distance he could have stopped it if the brake had been in good order; that the car

ran upon the deceased, and the front trucks of the car ran over him—I believe the car stopped as the back trucks reached him and rested upon his shoulders, or some part of his person. Mindus was permitted to testify that if the brake had been in good order he would have been able to stop the car before it struck the deceased.

With respect to the dock company, in answer to the sixteenth question, the jury say that it was guilty of negligence in not having a light on the front end of the car. It will be observed that that had not been charged as a ground of negligence against the defendant, the dock company. But after this verdict came in, the plaintiff below asked and was granted leave to amend his petition so as to set this up as a ground of negligence against the dock company, ostensibly to make the pleadings conform to the evidence. Nothing of that character was submitted to the jury or referred to in the charge, and we are of opinion that to permit such an amendment after the verdict, under the circumstances, was an abuse of discretion. It gave the defendants no opportunity to defend against the charge by showing, as it might have done, that such lack of light was not a proximate cause of the injury.

Beyond that it appears that the deceased had been in the employ of the dock company for something like ten years in various capacities; that among other things that he had done in the course of his employment he had ridden upon these empty cars; he had performed the same duties that the witness, Mindus, was performing upon this night; that the lights upon the docks were of the usual character used; that the method of operation of the cars was the method that had been in use there for years, and that deceased was entirely familiar with the whole situation and with the methods pursued by the dock company in the operation of its cars and its work generally. It appears that it had not been accustomed to using lights upon the ends of the empty cars being run in upon these side-tracks to give warning to anybody or for any purpose, and that deceased must have known this—no doubt but he knew it; he was acquainted with the situation and necessarily acquainted with the risks incident to the method in vogue there of doing this work, and it did not require an expert

person, but only a person of ordinary sense and observation, upon becoming acquainted with the method, to become at the same time aware of the dangers incident thereto. He had not only learned this while in their employment, but he had upon one occasion quit their employment for a while and had then again, with full knowledge of these things, accepted employment and resumed his work there.

It appears to us very clear that if this absence of light on the cars were charged as negligence on the part of the dock company, it was one of the assumed risks of the employment of deceased, and that his administratrix can not recover on that ground.

Now as to the receivers of the railroad company. Whether the car brake was so defective that the car could not be stopped in the usual distance of three car lengths, is somewhat doubtful; only one witness testified to that—the witness, Mindus. It appears that he made no statement of any defect in the car on the night that the accident happened or about that time to anybody, so far as we can discover from this evidence. It would seem to be quite natural upon the part of one in his situation, his car having run a man down and killed him, to make a statement of that kind, if the facts warranted it, in exoneration of himself. He not only does not make any statement orally at or about that time, but subsequently, upon making a written statement of the circumstances of the accident, he makes no mention of defective brakes. But when he comes to testify in this case, he tells about the defective brake. Another witness testifies that he inspected the car on the next morning, and that there was no defect in the brake, but there may be some uncertainty about whether this witness found the very car that caused the death of the deceased. But I say that it appears somewhat doubtful whether the brake was defective; not only because of the long silence of Mindus on the subject, but because of the statement of Mindus that he could have stopped the car, if the brake had been in good order, in about three car lengths, and the fact that it appears that he must have stopped it within about that distance; though it is claimed that the body of the deceased under

the wheels of the car had something to do with the stopping of the car.

Now, if the plaintiff can recover from the receivers of the railroad company because of a defective brake, it must be on the theory that the receivers owed to the deceased the duty of keeping these brakes upon the cars that it turned over to the dock company in such condition of repair that deceased, if he put himself in peril while walking upon, or across the tracks, on such an errand as he was then engaged in, might be saved by the prompt and efficient use of such brakes. This involves also the further duty devolving upon the dock company to use cars and to have men to be upon the lookout for the safety of one in the employment and position that the deceased then was, and to apply the brakes so as to save him from harm.

One member of this court is of the opinion that in the case of the dock company, engaged in the operation of its empty cars at this point, while placing them upon the sidings, the general rules of law, as to the duties of employers toward employes, lay no such duty upon it; that so far as any one in their employment in the situation the deceased was in is concerned, having no duty to perform upon the car or upon the track, it might have run this empty car upon the side-track without either brakes or brakeman thereon. Also, that the keeping of perfect brakes upon these cars, or having the cars in good order so far as the brakes are concerned, before they were turned over to the dock company, was a precaution not required of the receivers in the exercise of ordinary care and prudence as a duty to deceased, since one employed as the deceased was in carrying a bucket of oil across the tracks might reasonably be expected to look out for himself and get out of the way and keep off of the tracks as the cars were passing, and his failure to do so was not to be anticipated or apprehended or provided against, but this may be so far a mixed question of law and fact as that perhaps under proper instructions it should go to the jury.

We come now to the consideration of the question of contributory negligence involved in this case. I have already said that deceased knew the situation and the dangers thereof. He knew the degree of darkness prevailing upon this particular night;

he knew that there was a noise being made by the emptying of the car which was upon the tipple just at the time this empty car came upon him, a noise that would prevent him from hearing the running of the empty car down this grade toward him; he knew there was no light used upon these empty cars for a warning to those crossing backward and forward over those tracks. He was not required to work upon the tracks. Though his duty in going after this oil in pursuance of the order of his superior required him to cross the tracks in the performance thereof, he was not required to go upon the tracks until he had taken proper precautions for his safety; there was no hurry about it; he could pause and look and listen; he could take care and use his judgment; he could make sure of his safety; he could wait until the noise of the tipple had ceased; he was not required to exercise any great degree of speed in getting back with the oil he had been sent after; it was his duty to look after his own safety; he could have passed over this track in a distance of about eight feet and been out of harm's way by a few quick steps, but instead he walked on the track, though, as is said in the evidence, he walked *obliquely* upon the track; he walked along the track some little distance, though he may have been making his way from the west side of the track to the east side of the track all the time. The testimony is that his back was towards the approaching car, toward the north, his face toward the south, and he must have walked upon this track, though obliquely, some little distance; for the testimony of the witness, Mindus, is to the effect that the deceased, when he saw him upon the track, and when he, Mindus, applied the brake, was some sixty or seventy feet away from him; that the car at that time was proceeding toward deceased at the rate of about eight miles an hour; and that he applied the brake as well as he could. The car appears to have been stopped within a distance of from eighty to one hundred and twenty feet. He retarded the speed of the car, no doubt about that. From all the evidence it appears to us that the average speed of the car from the time the brake was applied until it overtook the deceased could not have been over three or four miles an hour; deceased must have walked at least half as fast as that. He

was, as I have said, upon the track when he was first observed by Mindus, so that he must have walked a distance of from twenty to forty feet upon the track before the car overtook him. That was quite unnecessary under the circumstances, and it was, in our view, extremely negligent upon his part. It does not appear that during his progress upon the track he at any time turned his face toward the northward to see if he could observe the approach of a car. If that were true, then it was exceedingly negligent for him to walk upon a track where a car was likely to come upon him and where he could not observe its progress toward him.

It is conceded that ordinarily and also upon this evening, the cars went by this shanty upon these tracks at the rate of one every three to six minutes; that they were going rapidly; that when a car was being emptied upon the tipple that was evidence to persons familiar with the operations there in the yard, therefore evident to the deceased, that an empty car was making its way from the tipple down upon one or the other of these four side-tracks. He had often ridden these cars himself. He knew exactly how that was done.

Under all of these circumstances, it seems to us entirely clear that deceased was guilty of negligence, contributing directly to his injury and death. The rule that contributory negligence defeats recovery may be a harsh rule; it may seem in some cases unjust and not humane, but it is a rule of law in force in this state, and we are bound to observe it and enforce it; and, while it may be open to this criticism in some cases, on the other hand a great deal may be and has been said in its favor and support; but it is sufficient for us to say that it is the law. *Wabash Ry. Co.* v. *Skiles,* 64 Ohio St., 458, and *Pennsylvania Co.* v. *Mahoney,* 22 C. C., 469, are in point upon this state of facts appearing in this case.

It is said that the failure of deceased to take care and look out for the car may be excused because of the custom that had grown up in the yard of giving warning, not of the approach of cars generally, but of giving warning when a defective car, or a car with a defective brake was started from the tipple on its course northward, and thence to the southward upon these side-

tracks. In our opinion that was not sufficient to excuse the apparent negligence in this case. It does not appear clearly that there was any rule or any custom to give warning of that kind for the benefit of a person who might happen to be crossing the track in this vicinity, but rather that the warning was for those upon whom devolved the duty of being upon the track in the vicinity of the tipple to operate certain machinery there and those who were receiving the cars and putting them upon the side-tracks; to those this warning was habitually given. It is said that no warning was given upon that occasion. But even if it had been a custom which had grown up there to give a warning or cry of this sort for the benefit of all who might be in and about the yards, doing all sorts of work, yet at the time this accident happened it appears that there was such a noise on account of the emptying of the car at the tipple that such ·a warning could not have been heard by the deceased; that as a matter of fact, Mindus, when he saw the deceased, when within from sixty to seventy feet of the car upon the track, gave all the warning of which he was capable by the use of his lungs and his voice, by screaming out to the deceased to apprise him of the fact that a car was approaching. In our judgment the verdict of the jury to the effect that deceased was not guilty of contributory negligence in this case is against the weight of the evidence.

There are some alleged errors in the charge to the jury. But I have taken so much time in the decision of this case that I will not stop now to refer to them at length, as the case must go back for retrial as to one defendant only, and the same charges are not likely to be repeated. And we think that in view of the special verdict no harm was done by the errors complained of in the charge. The chief complaint is that the court charged in effect that if either defendant was guilty of negligence in any respect charged, both might be responsible therefor. Parts of the charge are open to that construction and in that respect the charge was erroneous, but, as before indicated, the special findings enabled the court to avert any harm that might have resulted from such error.

It will be observed that here in a suit against two defendants on an alleged joint cause of action, that is, for alleged negligence of which they were jointly guilty, and on account of which they would therefore be jointly, as well as severally, liable, a joint general verdict and joint judgment are predicated upon a finding that the receivers were guilty of negligence in one respect, and the dock company was guilty of negligence in another respect, and neither act of negligence found was in any way concurrent with, dependent upon or resulted from, or was connected (as cause and effect) with the other, *i. e.*, there was no causal connection of the two acts of negligence found by the jury. *Pennsylvania Ry. Co.* v. *Snyder*, 55 Ohio St., 342, and *Pennsylvania Ry. Co.* v. *Meyers*, 12 C. C., 263, affords no authority upon this state of affairs. See Pomeroy Code Remedies, Section 308; *Missouri, K. & T. Ry. Co.* v. *Merrill*, 60 Pac. Rep., 819. But the conclusion we have reached makes it unnecessary to consider what the court might be required to do in dealing with that state of affairs, if the course taken and result arrived at in the court below were in all other respects unobjectionable.

We have given our attention to the case of *Gas & Gasoline Engine Co.* v. *Schelies*, 61 Ohio St., 298, upon the claim of the defendant in error, Swart, that the negligence of deceased was excusable or not fatal to recovery, because he was ordered into the place of peril. But in our opinion that case is not at all applicable to the situation which we have before us in the case at bar, for here deceased might have easily avoided the peril while obeying the order. It is a very unfortunate accident. It appears that a good man, a very useful man to his family, was suddenly taken away. But we can not find that there was any culpable negligence upon the part of the dock company, and we are of the opinion upon the evidence as it stands in the record that the verdict is not sustained as to the receivers of the railroad company, and it is reversed because it is against the weight of the evidence upon the question of contributory negligence.

As to the dock company, the case will be dismissed, because it does not appear that there was any negligence found, or that any negligence could be found that would have made the dock

company liable in this case, since nothing is charged against it that does not come within the doctrine of assumed risks upon the ·part of the deceased.

Defendant in error, Swart, excepted. The Huron Dock Company and receivers of the railroad company excepted to the overruling of the motion for leave to apply to the court below for a correction of the bill of exceptions.

*C. P. & L. W. Wickham,* for plaintiff in error and receivers of railway company.

*C. A. Thatcher* and *W. B. Starbird,* for Swart, administratrix.